772 F.2d 1007
 1986 A.M.C. 1965, Prod.Liab.Rep.(CCH)P 10,707
 Mildred V. DRAKE, Plaintiff, Appellee,
v.
RAYMARK INDUSTRIES, INC., et al., Defendants and Third-Party
Plaintiffs, Appellants.
Mildred V. DRAKE, Plaintiff, Appellee,
v.
RAYMARK INDUSTRIES, INC., et al., Defendants and Third-Party
Plaintiffs, Appellees,
Bath Iron Works Corporation, Third-Party Defendant, Appellant.
 Nos. 84-2033, 84-2034.
 United States Court of Appeals,
First Circuit.
 Argued April 3, 1985.
Decided Aug. 27, 1985.
 
 Mark G. Furey, Portland, Me., with whom Thomas R. McNaboe, Thompson, McNaboe & Ashley, Bernstein, Shur, Sawyer & Nelson, Hunt, Thompson & Bowie, Verrill & Dana, Portland, Me., and Skelton, Taintor, Abbott & Orestis, Lewiston, Me., were on brief, for Raymark Industries, Inc.
 Robert F. Hanson, Portland, Me., with whom James D. Poliquin and Norman & Hanson, Portland, Me., were on brief, for Bath Iron Works Corp.
 Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 This is an appeal from a summary judgment granted third-party defendant-appellee Bath Iron Works Corporation (BIW or Shipyard) on claims against it for contribution or indemnity by defendants and third-party plaintiffs-appellants Raymark Industries, Inc. and other manufacturers and distributors of asbestos products.
 
 I. BACKGROUND
 
 2
 This is one of approximately fifty cases brought in the District Court of Maine by present and former employees of BIW, or the representatives of their estates, against a large number of manufacturers and suppliers of asbestos products. BIW is in the shipbuilding and ship repair business. The complaints in the primary actions seek compensatory and punitive damages for injuries the employees of BIW allegedly sustained from exposure to appellants' products during the course of their employment at the Shipyard.
 
 
 3
 With the approval of the district court, the defendants-appellants filed a Model Third-Party Complaint against BIW in each of the actions against them. The case at bar tests the soundness of the district court's ruling on motion for summary judgment that none of the six counts of the Model Third-Party complaint could be maintained. We restate the allegations in the complaint seriatim.
 
 
 4
 Count I alleges that BIW knew or should have known that the material it purchased for use in the construction and/or repair of ships included asbestos and products containing asbestos, and that its employees would come into contact with such materials; that BIW knew or should have known that working with asbestos and products containing asbestos posed unreasonable health dangers unless adequate precautionary measures were taken; that BIW wantonly, recklessly and negligently failed to exercise due care vis-a-vis its employees in ten specific ways; that any damages to plaintiffs were caused by BIW; that any judgment against the defendants should be reduced by the amount of BIW's workers' compensation lien under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) or, in the alternative, the defendants are entitled to a judgment against BIW in the amount of such liens. Defendants also seek declaratory relief that BIW be ordered to pay directly to them any future workers' compensation benefits to which the plaintiffs became entitled.
 
 
 5
 Count II seeks contribution or indemnity for any punitive damage judgments for the plaintiffs.
 
 
 6
 Count III alleges that the construction of and/or repair of ships involving asbestos and products containing asbestos were inherently dangerous activities; that defendants had no control over the products sold once they were in the possession of BIW; that BIW owed defendants a duty, independent of any duty to its employees, not to use asbestos and products containing asbestos in such a willful, wanton, reckless or negligent manner as to make them unreasonably hazardous to BIW employees or other persons; that defendants' products were not dangerous to BIW employees if used with due care; that defendants are entitled to be indemnified by BIW to the full extent of any judgments against them or, in the alternative, to the extent of BIW's workers' compensation liens.
 
 
 7
 Count IV alleges a claim for contribution for any damages for consequential and punitive damages recovered by plaintiffs against defendants, including loss of consortium.
 
 
 8
 Count V alleges that BIW had a duty to provide medical examinations, diagnosis, and treatment for the illness of its employees; that BIW's medical personnel wantonly, recklessly and negligently failed to perform their duties; that such failure caused or aggravated the asbestos-related diseases of the employees; that defendants are entitled to contribution and indemnification by BIW for any judgments against them or, in the alternative, to indemnification to the extent of BIW's workers' compensation lien.
 
 
 9
 Count VI alleges that BIW was the owner or owner pro hac vice of the vessels upon which its employees worked within the meaning of 33 U.S.C. Sec. 902(21); that BIW acted willfully, wantonly, recklessly and negligently as owner or owner pro hac vice ; that BIW's conduct was the proximate cause of the damages claimed by plaintiffs; that under 33 U.S.C. Sec. 905(b), BIW is liable to plaintiffs for all damages claimed in their complaints against defendants.
 
 
 10
 With one exception, all of the claims for contribution and/or indemnity are based on alleged breaches of duty by BIW to its employees. The exception is paragraph 19 of Count III which states in pertinent part: "BIW owed defendants a duty, independent of any duty it owed its employees, not to employ" the asbestos materials so as to make them unreasonably dangerous to the employees or others. Defendants failed to state whether the alleged duty is based on tort or contract. Nor did they allege the existence of an express or implied contract between BIW and the defendants regarding the use of asbestos material. The defendants, then, "are asking us to hold a user liable to a manufacturer for the former's negligent use of the latter's defective product." Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 723 (2d Cir.1978) (Friendly, J.). Like the Second Circuit, "[t]his we decline to do." Id. ; cf. 2A Larson, The Law of Workmen's Compensation Sec. 76.84 at 14-746 (1985) ("But when a purchaser buys a product, does he make an implied contract with the manufacturer to use the goods in such a way as not to bring liability upon the manufacturer? This would be stretching the concept of contract out of all relation to reality."). The district court did not expressly rule on this claim, probably because it was not pressed below. Certainly, the defendants have not adverted to it at all in their brief to this court. Given these circumstances, we consider this claim to have been dropped but, in any event, we rule that it must be dismissed for failure to state a cause of action upon which relief can be granted. The basis of liability for defendants' third-party action is, therefore, grounded solely on BIW's alleged breach of duties to its employees.
 
 
 11
 The district court rendered three separate opinions. On Counts I through V, which we shall refer to as the land-based or nonmaritime claims, the court granted summary judgment for BIW, excepting only those claims for pro tanto indemnification. 589 F.Supp. 1563 (D.Me.1984). The court based its ruling on the grounds that the exclusivity provision of the Maine Workers Compensation Act (MWCA), Me.Rev.Stat.Ann. tit. 39, Sec. 4 (1978 and Supp.1983-84), had been interpreted by the Maine Supreme Judicial Court to bar all noncontractual rights of contribution and indemnity. McKellar v. Clark Equipment Co., 472 A.2d 411, 416 (Me.1984); Roberts v. American Chain & Cable Co., Inc., 259 A.2d 43, 51 (Me.1969). In a subsequent opinion, the district court granted summary judgment for BIW on the pro tanto claims.
 
 
 12
 Because no benefits have been paid to Forrest Drake, his widow or his dependents under the Maine Workers' Compensation Act, and BIW and its insurer have waived any workers' compensation lien under the LHWCA, there is no predicate for the pro tanto relief sought by defendants against BIW in their third-party complaints.
 
 
 13
 On Count VI the district court held "that BIW was not during the relevant periods the owner pro hac vice of vessels being constructed or repaired in its yard and that the cause of action asserted in Count VI of R-M's third-party complaints is therefore barred by Section 905(a) of the LHWCA."
 
 
 14
 We shall review first the district court's disposition of Count VI, for contribution based on the alleged negligence of the BIW qua shipowner vis-a-vis the injured employees. We then evaluate the court's disposition of the land-based claims. Our ultimate conclusion is the same as the district court's--that none of the counts contained in the model third-party complaint can withstand a motion for summary judgment--although we reason to that conclusion via a different route.
 
 
 15
 II. THIRD-PARTY LIABILITY AS A SHIPOWNER UNDER Sec. 905(b)
 
 
 16
 In Count VI of their Model Third-Party Complaint, defendant manufacturers press a claim against Bath Iron Works for shipowner negligence, purportedly based on the Longshore and Harbor Workers' Compensation Act[1] (LHWCA or Longshore Act), 33 U.S.C. Sec. 905(b). Defendants correctly claim that determinations regarding the viability of Sec. 905(b) negligence claims are governed by federal maritime principles. Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, at 165 n. 13, 101 S.Ct. 1614 at 1621 n. 13, 68 L.Ed.2d 1 (1981). Turning to the statute, the pertinent language reads as follows:
 
 
 17
 In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.
 
 
 18
 33 U.S.C. Sec. 905(b) (emphasis added).
 
 
 19
 In the case before us, the injured employee's representative did not bring an action against BIW as shipowner pro hac vice, or against any other shipowner; she filed no Sec. 905(b) action whatsoever. Instead, she filed strictly nonmaritime, state causes of action against the various asbestos product manufacturers and suppliers based on Maine law and grounded on diversity jurisdiction. Her claims involved strict liability, breach of warranty and negligence. Despite the nonmaritime nature of these primary claims, defendants seek to assert Sec. 905(b) as a basis for indemnity or contribution[2] from BIW, which by its terms confers authority to bring a shipowner negligence action upon the injured employee or his/her representative, and the employer as statutory assignee. See 33 U.S.C. Sec. 933(b); Rodriguez v. Compass Shipping Co., Ltd., 451 U.S. 596, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981).
 
 
 20
 Although contribution has a long and venerable history in admiralty and maritime affairs, see Cooper Stevedoring Co. v. Kopke, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); see generally Staring, Contribution and Division of Damages in Admiralty Cases, 45 Calif.L.Rev. 304 (1957), we doubt whether a contribution action premised solely upon Sec. 905(b) can proceed without having as its predicate a Sec. 905(b) primary action properly brought by one of the parties authorized by the statute. Especially in a situation such as this, where the primary action is based on distinctly nonmaritime rights and duties--duties owed by any manufacturer of a product later determined to be defective and which bear no significant relationship to maritime commerce--it seems that defendants cannot use Sec. 905(b) as a source of a right to contribution from a shipowner or owner pro hac vice. Our study of the decisional law failed to uncover any cases where Sec. 905(b) was allowed to be asserted as the basis for liability in a third-party action where it was not sued upon in a primary action. We note, however, that the parties did not raise or brief this question. We therefore shall bracket this question and assume arguendo that defendants are not barred from bringing a contribution action based on the plaintiff's omission of a Sec. 905(b) claim in her action.
 
 
 21
 Appellee BIW contends that defendants' Sec. 905(b) action cannot be maintained because the injury allegedly caused by BIW's dereliction of duty as a shipowner pro hac vice was not a maritime tort, which is a fundamental requirement for an injury to be cognizable under Sec. 905(b). The appellants respond by arguing that an independent basis for admiralty jurisdiction need not be shown to redress an injury under the section; all that is required is satisfaction of the literal words of the statute, which does not so much as mention the words "maritime tort" or "admiralty jurisdiction."
 
 
 22
 The question before us, then, is: does Sec. 905(b) recognize only maritime torts, i.e., torts cognizable in admiralty (regardless of the actual basis of jurisdiction, such as diversity), or does its range encompass nonmaritime torts occurring on a vessel but where the tests for admiralty jurisdiction are not satisfied? After careful study, we think the scope of Sec. 905(b) is limited to maritime torts. To explain our conclusion, we must examine the definition of the term "maritime tort," retrace the origin of Sec. 905(b) in the warranty of seaworthiness, and demonstrate why the alternative conclusions about the scope of Sec. 905(b) that have been advanced fail to accord with logic, the legislative history of the section, and the admiralty "traditions of simplicity and practicality." Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 631, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959); The Lottawanna, 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1874).
 
 A. Maritime Tort
 
 23
 It is elementary, almost axiomatic, that maritime torts are those which fall within the admiralty jurisdiction or satisfy the tests for the application of admiralty law. Executive Jet Aviation v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), makes this point plainly: "[d]etermination of the question whether a tort is 'maritime' and thus within the admiralty jurisdiction of the federal courts...." Id. at 253, 93 S.Ct. at 497 (emphasis added); see also Victory Carriers, Inc. v. Law, 404 U.S. 202, 204, 92 S.Ct. 418, 420, 30 L.Ed.2d 383 (1971). The Court in Executive Jet began its analysis of the proper scope of maritime tort jurisdiction from this premise, and rejected the traditional dependence of the determination solely upon the "locality of the wrong." Id. The Court concluded that a showing of a "relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test." Id. 409 U.S. at 261, 93 S.Ct. at 501; see also Austin v. Unarco Industries, Inc., 705 F.2d 1 (1st Cir.), cert. dismissed, 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983). In Foremost Insurance Co. v. Richardson, 457 U.S. 668, 673, 102 S.Ct. 2654, 2657, 73 L.Ed.2d 300 (1982), the Court held that this two-pronged situs and status test must be met in all actions sought to be governed by admiralty law.
 
 
 24
 Before Executive Jet, then, to be classified as a maritime tort the wrong had to fall within admiralty jurisdiction, which in turn required only that the wrong occur or take effect on navigable waters. Foremost Insurance, 457 U.S. at 672, 102 S.Ct. at 2657; Kermarec v. Compagnie Generale, 358 U.S. at 628, 79 S.Ct. at 408; Williams v. Avondale Shipyards, Inc., 452 F.2d 955, 958-59 (5th Cir.1971). One special maritime tort action, the strict liability unseaworthiness action for stevedores and other shorebased maritime workers, however, required that additional elements besides admiralty jurisdiction be satisfied. To fasten liability without fault onto a vessel and its owners, the courts also required that the vessel be "in navigation," Waganer v. Sea-Land Service, Inc., 486 F.2d 955, 958 (5th Cir.1973); see also Williams v. Avondale, 452 F.2d at 957; G. Gilmore & C. Black, The Law of Admiralty 441 (1975), and that the injured worker or his work group be engaged in traditional "ship's work," not some land-based specialty work. West v. United States, 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed.2d 161 (1959); United Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959).
 
 
 25
 The unseaworthiness action, despite its strictures, engendered a vast amount of litigation and imposed great costs upon stevedore employers and shipowners, which resulted in congressional abolition of it through the passage of Sec. 905(b). We briefly review the genesis and history of the unseaworthiness action before turning to examine the legislative history of Sec. 905(b) and the other 1972 Amendments to the LHWCA.
 
 B. Unseaworthiness
 
 26
 Almost twenty years after the original passage of the Longshore Act, the Supreme Court was confronted with a case where a stevedore, injured when a ship's winch and boom broke, sought to sue the ship and its owner for damages. The Court held that the ship's obligation of seaworthiness, traditionally owed by ships to seamen, extended to a stevedore who was injured while aboard the vessel and incurring seamen's hazards. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The unseaworthiness claim so authorized omitted any requirement that a shipowner's negligence or fault in causing the injury be proven. In Sieracki, the Court stated that its holding did not conflict with the Longshore Act because the LHWCA did not foreclose personal injury actions under general admiralty law except against the employer. Id. at 101, 66 S.Ct. at 880. Commentators have since suggested that Sieracki was a direct result of the failure of Congress to improve the paltry compensation payable under the LHWCA and raise the incentives for safety in the shipping industry. G. Gilmore & C. Black, The Law of Admiralty at 446-48.
 
 
 27
 Ten years later, with "Sieracki -seamen" suits flourishing, the Court was again confronted with a seeming inequity. The absolute nondelegable seaworthiness warranty imposed upon a shipowner had resulted in shipowner liability even where others, chiefly the stevedoring companies, were responsible for the workers' injuries. In Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court decided that the vessel could recover the damages for which it was liable to the injured longshoreman from the stevedore company if it had breached an express or implied warranty of workmanship performance owed the vessel. Thus was erected the final leg of the triangular damage suits which had originated with Sieracki.
 
 
 28
 Congress undertook a comprehensive reform of the Longshore Act in 1972, including as a prime element the abolition of the Sieracki-Ryan unseaworthiness action for covered workers. See Aparicio v. Swan Lake, 643 F.2d 1109 (5th Cir.1981). In its place a complex quid pro quo was effectuated which included for covered workers higher compensation for injuries, and the option of bringing a negligence action against the vessel if the injury was caused "by the negligence of a vessel." 33 U.S.C. Sec. 905(b); see Scindia Steam Navigation, 451 U.S. at 164-66, 101 S.Ct. at 1620-22. Strict liability actions under unseaworthiness theory and contribution or indemnity from an employer based on express or implied warranties were expressly barred. 33 U.S.C. Sec. 905(b).
 
 
 29
 Our review of the origin and demise of longshore and harbor workers' unseaworthiness actions has led us to conclude that Sec. 905(b) implicitly requires that a tort be consummated within the admiralty jurisdiction to be cognizable under the statute. The maritime tort action for negligence was a feature of the common law of admiralty prior to Sieracki-Ryan, when one group of torts involving longshore workers, those committed on board a vessel lying in navigable waters, were excepted from the negligence standard and given strict liability treatment. Section 905(b) was enacted to bar this special treatment, and essentially returned the applicable law to its pre-Sieracki state, when negligence had to be proven to obtain damages from a vessel.
 
 
 30
 Three circuits in addition to ourselves have determined that Congress enacted Sec. 905(b) not to create a new cause of action for any compensation system-covered worker but to abolish the judicially-authorized unseaworthiness action fashioned for longshore workers "injured on navigable waters while working on a ship...." Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 205, 98 L.Ed. 143 (1953); see H.R.Rep. No. 92-1441, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Ad.News 4698, 4702 (hereinafter H.R.Rep.). The former Fifth Circuit rendered the first decision on the question of the scope of actions that can properly be brought under Sec. 905(b). It held that the legislative history of the 1972 Amendments to the Longshore Act "leaves little doubt that Congress did not intend Sec. 905(b) to create a new or broader cause of action in admiralty." Parker v. South Louisiana Contractors, 537 F.2d 113, 118 (5th Cir.1976). The Fourth Circuit followed suit shortly thereafter in Holland v. Sea-Land Service, 655 F.2d 556 (4th Cir.1981), and held that only maritime torts are cognizable under the provision, "torts cognizable under traditional federal admiralty jurisdiction...." Id. at 558. The Holland court specifically determined that Sec. 905(b) "preserves [the employee's] right under prior law to recover for third-party negligence, but it does not expressly enlarge the traditional jurisdiction of admiralty over maritime torts." Id. at 559. In Christoff v. Bergeron Industries, Inc., 748 F.2d 297 (5th Cir.1984), the new Fifth Circuit reaffirmed the earlier ruling in Parker and stated that "Sec. 905(b) neither extended the boundaries of traditional admiralty jurisdiction nor converted ordinary tort claims against vessels into federal questions independent of admiralty." Id. at 298. The Eleventh Circuit found these earlier rulings persuasive authority for its holding that Sec. 905(b), "rather than creating a new cause of action, merely preserves certain preexisting remedies to injured workers against third parties." Harville v. Johns-Manville Products Corp., 731 F.2d 775, 778 n. 9 (11th Cir.1984).
 
 
 31
 Having concluded that only torts that are maritime are cognizable under Sec. 905(b), the governing principles for determining whether admiralty law will apply[3] are provided by Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, as extended by Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654. Because defendants' third-party Sec. 905(b) action is predicated solely upon BIW's alleged dereliction of duty qua shipowner pro hac vice vis-a-vis its employee Drake, and not based upon any alleged duty running from BIW to defendants, the proper question is whether plaintiff Drake could have maintained a Sec. 905(b) action against BIW for his injuries. Accordingly, we look to whether the injury forming the basis of Drake's primary action would be cognizable in admiralty, or have admiralty law applied to it.
 
 
 32
 We consider our decision in Austin v. Unarco to have provided the channel markers for deciding that question. As we held there, to qualify as a maritime tort under Executive Jet, the wrong (1) must have occurred on navigable waters, i.e., meet a situs or locality test, and (2) must have borne a significant relationship to a maritime activity, i.e., meet a nexus test. Austin v. Unarco, 705 F.2d at 8-14. Thus, although we believe that it is necessary for the maintainance of a Sec. 905(b) action that a party allege that a vessel's negligence was the source of the injury, such an incantation does not, as defendants contend, automatically result in the application of admiralty law.
 
 
 33
 Turning to the Executive Jet criteria, we first consider the situs requirement, i.e., that the injury occur or take effect on navigable waters. As the Eleventh Circuit noted in Harville, "when an injury is the result of a number of exposures, only some of which occurred in a maritime situs, and where the effects of the various exposures are indivisible," the question whether the situs test is met is raised. Harville, 731 F.2d at 782. That court concluded, in agreement with the Second,[4] Fourth[5] and Ninth Circuits,[6] that the requirement was met "if the plaintiff has been exposed to asbestos on navigable waters regardless of whether he has also suffered exposures on land." Id. We see no reason to depart from the majority view on this question and we adopt it as our own. Thus, as in Austin v. Unarco, from our review of the record the situs requirement poses no problem to the characterization of Drake's injury as a maritime tort and "[t]he only issue, therefore, is whether the wrong bears a significant relationship to traditional maritime activity." Austin v. Unarco, 705 F.2d at 8-9; see Executive Jet, 409 U.S. at 261, 93 S.Ct. at 501.
 
 
 34
 Since our decision in Unarco, several other courts have considered Executive Jet 's second requirement of a nexus to maritime activity in relation to asbestos injuries sustained by shipyard workers. All have reasoned to the same conclusion albeit using somewhat different markers en route. Compare, e.g., Harville v. Johns-Manville Products Corp., 731 F.2d 775; Lowe v. Ingalls Shipbuilding, 723 F.2d 1173, 1187-90 (5th Cir.1984); Austin v. Unarco, 705 F.2d 1; Keene Corp. v. United States, 700 F.2d 836, 843-45 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 195, 78 L.Ed.2d 171 (1984); Owens-Illinois, Inc. v. United States District Court, 698 F.2d 967 (9th Cir.1983).
 
 
 35
 In Unarco, we focused on the nature of the decedent's job rather than the type of project--vessel construction or repair--on which he worked. We concluded that the plaintiff was entitled to invoke admiralty only if the decedent was "injured while doing work traditionally done by members of the crew and thus, presumably, subject to many of the same hazards as seamen." 705 F.2d at 12. We ruled that because the decedent had been engaged in work "requiring special equipment and skills" not commonly found among the members of the ship's crew, admiralty law was not applicable to plaintiff's claims. Id. at 12-13. Other courts prior to the Eleventh Circuit's ruling in Harville focused on other criteria. The Harville Court, however, summarized and blended these various considerations, including our own, into a four-part test which harmonized with Kelly v. Smith, 485 F.2d 520 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), and Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300. The criteria to be considered under this approach are the function and roles of the parties, the type of vehicles and instrumentalities involved, the causation and type of injury, and traditional concepts of the role of admiralty law. This four-part approach to determining whether the tort possesses a sufficient nexus to traditional admiralty concerns has since been adopted by the Ninth Circuit, see Myhran v. Johns-Manville Corp., 741 F.2d 1119 (9th Cir.1984), the Fifth Circuit, see Woessner v. Johns-Manville Sales Corp., 757 F.2d 634 (5th Cir.1985), and by the Fourth Circuit en banc in a case overturning its lone decision holding that admiralty law applied to asbestos torts suffered by shipyard workers, see Oman v. Johns-Manville Corp., 764 F.2d 224 (4th Cir.1985) (en banc overruling of White v. Johns-Manville Corp., 662 F.2d 234 (4th Cir.1981)). The Harville approach to determining the nexus prong of the Executive Jet test also seems to us to be the best formulation yet set forth because it integrates a wide variety of traditional concerns of admiralty law. Accordingly, we adopt this approach.[7]
 
 
 36
 With our course thus fixed, we recognize that what appeared to be a pioneer voyage is actually just another routine trip. Among all six circuits that have considered the question, the universal conclusion is that admiralty law does not apply to these torts. We need not retrace the steps taken by the Eleventh Circuit in Harville nor ours in Unarco to show why the nexus prong of Executive Jet has not been satisfied here; suffice it to say that the facts here are essentially the same as in the other cases cited which found that lack of sufficient relation to traditional admiralty concerns negated the application of admiralty law.[8] We find it rather ironic, however, that in those other course-making cases it was the asbestos companies who were urging that admiralty law did not apply to the injuries in the primary actions, and now we find basically the same defendants attempting to refute their own prior position. The tort cannot be outside admiralty jurisdiction when sued upon in the primary action and then, by some magic, be transmuted into a maritime tort merely because it is later emphasized that some of the work where the injury occurred was performed upon a ship. That the employees worked primarily upon ships had already been taken into account in the earlier analysis. Our conclusion, then, is that the injury sustained by Drake lacked sufficient connection to the traditional concerns of admiralty, and thus, neither plaintiff nor defendants can bring a Sec. 905(b) negligence action against BIW qua shipowner pro hac vice.
 
 
 37
 We recognize that there are cases which have either ignored or overlooked the Executive Jet nexus test in determining whether a tort was cognizable under Sec. 905(b). These are Lundy v. Litton Systems, Inc., 624 F.2d 590 (5th Cir.1980), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981),[9] McCarthy v. The Bark Peking, 716 F.2d 130 (2d Cir.1983),[10] and Hall v. Hvide Hull No. 3, 746 F.2d 294 (5th Cir.1984). Of these, only the Hall opinion requires discussion, for it utilizes and extends the analysis used in the prior two cases.
 
 
 38
 In Hall, the defendant ships were actually hulls floating on navigable water during shipbuilding construction. The question before the court was the same as that in Lundy, viz., whether ships under construction qualified as vessels under Sec. 905(b). The court felt that it was bound by Lundy 's holding that torts committed on vessels under construction were cognizable under Sec. 905(b), despite other Fifth Circuit authority holding that maritime tort jurisdiction required satisfaction of the Executive Jet criteria, including a relationship to traditional maritime activity:
 
 
 39
 The panel agrees that we are bound by Lundy and that, under the law of the circuit, it must be followed in the absence of en banc overruling. However, the panel also notes that an issue of bancworthy dimension may be presented by the conflict between Lundy 's rationale and some expressions in our more recent jurisprudence that an injury to ship construction workers on board a vessel under construction, although on navigable waters, is not a maritime tort, since ship construction is not a maritime business. See, e.g., Lowe v. Ingalls Shipbuilding, A Division of Litton, 723 F.2d 1173, 1185, 1187 (5th Cir.1984).
 
 
 40
 Id. at 296 (footnote omitted). The panel's signal for rehearing en banc went unheeded. 746 F.2d at 294 (5th Cir.1985).
 
 
 41
 The Hall court attempted to square Lundy with Lowe and Parker v. South Louisiana Contractors, 537 F.2d 113, the Fifth Circuit's other cases, by asking the question whether Sec. 905(b) jurisdiction extended beyond maritime tort jurisdiction as demarcated by Executive Jet. The court noted that torts occurring on vessels under construction qualified as maritime torts under pre-Executive Jet standards, citing to Williams v. Avondale Shipyards, Inc., 452 F.2d 955, where a ship construction worker working on a launched but uncompleted vessel floating in navigable waters was held entitled under general maritime negligence principles to sue the vessel or its owner for injuries sustained while on the uncompleted vessel in navigable waters. Id. at 958-59. It then declared that the principles of Director, OWCP v. Perini North River Associates, 459 U.S. 297, 320 n. 29, 103 S.Ct. 634, 649 n. 29, 74 L.Ed.2d 465 (1983), which held that Congress lacked an intention to constrict the boundaries for LHWCA compensation from those operative pre-1972 were applicable as well to maritime tort jurisdiction under Sec. 905(b). In particular, the Hall court held that the statutory language of Sec. 905(b), which was enacted subsequent to the Williams opinion, was intended to preserve the extent of maritime jurisdiction over a vessel under construction for Sec. 905(b) purposes that had been previously recognized by Williams.[11] Thus, despite Executive Jet's addition of the nexus requirement and the holding of Lowe within its own circuit that ship construction is not a maritime business, the Hall court held that the former range of maritime torts caused by vessel negligence were intended to be grandfathered-in to the Sec. 905(b) jurisdictional range and qualify as maritime torts. 746 F.2d at 300.
 
 
 42
 Insofar as the Hall panel held that only maritime torts are cognizable under Sec. 905(b) we are in agreement. Our disagreement lies in that court's creation of a double standard for maritime tort jurisdiction. For actions brought under Sec. 905(b) the Fifth Circuit would apparently revert to pre-1972, and pre-Executive Jet standards and apply only a situs test; for actions under general maritime jurisdiction, it would require satisfaction of both the situs and nexus tests.
 
 
 43
 We discern no basis for this construction of the jurisdictional range of Sec. 905(b). Perini was concerned solely with compensation, not with maritime tort jurisdiction, and these two boundaries have for a long time been quite distinct, see infra at 1018-1019. We have uncovered no legislative history even intimating that Congress wished to incorporate into Sec. 905(b) the then-current boundaries of maritime tort jurisdiction, and place them beyond the traditional common law powers of the admiralty courts. Under the Fifth Circuit's construction, Sec. 905(b) tort jurisdiction is static and distinct from other maritime tort jurisdiction, and a double standard has been created. This is the inevitable result of the Hall rule even though that court itself states that "we find no ... distinction intended by Congress between a Sec. 905(b) action and admiralty jurisdiction," 746 F.2d at 300. We have discovered no predicate for the Fifth Circuit's unusual rule in law, logic, legislative history, or policy and we decline to hold that jurisdiction under Sec. 905(b) requires satisfaction merely of the definitional elements of the provision, and the situs requirement.[12]
 
 
 44
 The other theory that has been advanced, and uniformly rejected, maintains that when Congress enlarged shoreward the geographic areas where compensation would be payable under the Act as a part of the 1972 Amendments, it implicitly adopted the same geographic range for Sec. 905(b)'s scope. See, e.g., Parker v. South Louisiana Contractors, 537 F.2d 113 (discussing theory that Sec. 905(b) jurisdiction and compensation system-covered areas parallel one another). It is not clear whether appellants here subscribe to this or another theory of Sec. 905(b)'s scope; they all but omitted argument on this point and made only the generalized claim that no independent admiralty jurisdiction had to be shown. In any event, an extended response is not necessary.
 
 
 45
 While the geographic extension shoreward of the range of areas where compensation would be payable under the Act was discussed in great detail in legislative hearings and committee reports, see, e.g., Perini, 459 U.S. at 314 n. 24, 317-22, 103 S.Ct. at 646 n. 24, 647-50; see also Herb's Welding Inc. v. Gray, --- U.S. ----, ----, 105 S.Ct. 1421, 1425, 84 L.Ed.2d 406 (1985), there is no discussion of extending the jurisdictional range of torts cognizable under Sec. 905(b) via negligence actions beyond that allowed for other maritime torts. The one example the House Committee provided to illustrate its conception of the scope of Sec. 905(b) negligence actions was that of a stevedore who slipped on an oil spill on a vessel's deck while loading or unloading cargo--a classic maritime tort. See H.R.Rep. at 2740. Moreover, the express purpose of enacting Sec. 905(b) was to undo the judicial decisions in Sieracki and Ryan and their unseaworthiness progeny, id. at 4703, which comprise a species of maritime tort.
 
 
 46
 Interpreting the scope of Sec. 905(b) jurisdiction to include negligence actions other than maritime torts would federalize torts in an area which currently are governed by state law. We find it difficult to believe that a move this momentous, had Congress intended it, would not have received explicit discussion. Moreover, the Supreme Court's comments in Victory Carriers directly counsel against an extension of admiralty jurisdiction on such slender evidence as advanced here:
 
 
 47
 We are dealing here with the intersection of state and federal law. As the law now stands, state law has traditionally governed accidents like this one. To afford respondents a maritime cause of action would thus intrude on an area that has heretofore been reserved for state law, [and] would raise difficult questions concerning the extent to which state law would be displaced or preempted.... In these circumstances, we should proceed with caution in constitutional and statutory provisions dealing with the jurisdiction of the federal courts.
 
 
 48
 Victory Carriers, 404 U.S. at 211, 92 S.Ct. at 424; see also Austin v. Unarco, 705 F.2d at 13. We agree with the Fifth Circuit's views as expressed in Parker v. South Louisiana Contractors, 537 F.2d 113, that there is no evidence that Congress intended to extend Sec. 905(b) tort jurisdiction to encompass the shoreside injuries occurring on a vessel merely because those injuries would be compensable under the LHWCA.
 
 
 49
 III. LIABILITY OF BIW IN ITS CAPACITY AS EMPLOYER
 
 
 50
 We now turn to the land-based third-party negligence claims alleged in Counts I through V, which challenge acts or omissions of BIW in its capacity as an employer. There can be no question that if the MWCA is the governing law, it bars these actions. Section 4 of the Maine Act states that employers who provide workers' compensation "shall be exempt from civil actions because of such injuries either at common law or under sections 141 to 148, under Title 14, sections 8101 to 8118 or under Title 18-A, section 2-804." Me.Rev.Stat.Ann. tit. 39, Sec. 4 (1978).[13] This provision has been unequivocally interpreted by the Maine Supreme Judicial Court to provide a covered employer with immunity from third-party claims arising from work-related injuries to its employees that "extends to all non-contractual rights of contribution and indemnity." McKellar v. Clark Equipment Co., 472 A.2d at 416; Roberts v. American Chain & Cable Co., 259 A.2d at 51.
 
 
 51
 Defendants do not dispute the effect of the Maine statute, but argue that it does not apply. Their argument, as we understand it, runs as follows: Plaintiffs' claim for workers' compensation was made under the Longshore Act, 33 U.S.C. Secs. 901-950, not the Maine Act; therefore, it is the LHWCA that is implicated. This means that it is the exclusivity provision of the LHWCA, Sec. 905(a),[14] that controls and under Lockheed Aircraft Corporation v. United States, 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983), Sec. 905(a) does not bar third-party actions.
 
 
 52
 Since the linchpin of defendants' argument is Lockheed, we turn first to that decision. Lockheed involved the crash of a plane manufactured by Lockheed Aircraft Corporation and owned and operated by the United States Air Force. The administrator of the estate of a civilian employee of the United States Navy killed in the crash brought suit against Lockheed as the manufacturer of a defective product. Lockheed brought a third-party indemnity action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. Secs. 1346(b), 2671-80. The question was whether the exclusivity provision of the Federal Employees' Compensation Act (FECA), 5 U.S.C. Sec. 8116(c), barred Lockheed's indemnification action. In holding that it was not a bar, the Court relied heavily on Weyerhaeuser S.S. Co. v. United States, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1, which had "considered FECA's exclusive-liability provision and carefully reviewed its legislative history." Lockheed, 460 U.S. at 194, 103 S.Ct. at 1036. The Court stated:
 
 
 53
 The Court's reasoning in Weyerhaeuser applies with equal force in the present case. The Government advances the same arguments before us now that it unsuccessfully advanced in Weyerhaeuser. To paraphrase the Weyerhaeuser Court's conclusion, "[t]here is no evidence whatever that Congress was concerned with the rights of unrelated third parties, much less of any purpose to disturb settled doctrines of [tort] law affecting the mutual rights and liabilities of private [parties] in [indemnity] cases." Id., at 601 [83 S.Ct. at 929]. Section 8116(c) was intended to govern only the rights of employees, their relatives, and people claiming through or on behalf of them. These are the only categories of parties who benefit from the "quid pro quo" compromise that FECA adopts.
 
 
 54
 Lockheed, 460 U.S. at 196, 103 S.Ct. at 1037 (footnotes omitted).
 
 
 55
 Defendants seize upon this language to argue that Lockheed swept away the third-party bar of Sec. 905(a) along with that of Sec. 8116(c) of FECA. We disagree. We first point out that neither Weyerhaeuser nor Lockheed implicated the LHWCA. Secondly, the Court stressed twice in the course of its opinion that the underlying substantive law granting Lockheed a right to indemnification was uncontroverted, 460 U.S. at 192, 199 n. 8, and the only question for decision was whether Sec. 8116(c) of FECA interposed a bar to a third-party action against the United States. The holding in Lockheed is carefully and precisely worded:
 
 
 56
 The District Court held that Lockheed had a right to indemnity under the governing substantive law, but the Court of Appeals did not rule on that question. Accordingly, we do not consider it. We adhere to the decision in Weyerhaeuser, and hold only that FECA's exclusive-liability provision, 5 U.S.C. Sec. 8116(c), does not directly bar a third-party indemnity action against the United States. We reverse the judgment of the Court of Appeals and remand the case for further consideration consistent with this opinion.
 
 
 57
 460 U.S. at 199, 103 S.Ct. at 1038. Lockheed requires that we determine whether there is a basis in substantive law for defendants' third-party action against BIW; it does not overrule three decades of consistent Supreme Court jurisprudence regarding the interpretation of Sec. 905(a).
 
 
 58
 * BIW's employees are concurrently covered by the MWCA and the LHWCA. In Sun Ship, Inc. v. Pennsylvania, 447 U.S. 715, 716, 100 S.Ct. 2432, 2434, 65 L.Ed.2d 458 (1980), the Court, in a unanimous opinion, held that "a State may apply its workers' compensation scheme to land-based injuries that fall within the coverage of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), as amended in 1972. 33 U.S.C. Secs. 901-950." After tracing the "evolution of the law of compensation for workers injured in maritime precincts," id. at 717, 100 S.Ct. at 2435, the Court concluded: "We therefore find no sign in the 1972 amendments to the LHWCA that Congress wished to alter the accepted understanding that federal jurisdiction would coexist with state compensation laws in that field in which the latter may constitutionally operate under the Jensen doctrine." Id. at 722, 100 S.Ct. at 2437 (footnote omitted). In Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), the Court held that states are constitutionally barred from applying their compensation systems to maritime injuries and thus interfering with overriding federal policy of a uniform maritime law. The Sun Ship Court emphatically rejected the argument that for compensation "jurisdictional exclusivity is--in 'fact' or in 'law'--implied in the LHWCA." Sun Ship 447 U.S. at 723, 100 S.Ct. at 2438; see also id. at 723-26, 100 S.Ct. at 2438-39.
 
 
 59
 The holding and reasoning of Sun Ship compel the conclusion that the applicable substantive law here is both the MWCA and the LHWCA. Since there can be no doubt that the Maine Act bars this third-party action, our next inquiry is as to the effect of Sec. 905(a).
 
 
 60
 The question is whether a nonvessel tortfeasor who may be found liable for injuries to employees of a LHWCA-covered employer has a right to indemnity or contribution from the employer. Section 905(a) provides in pertinent part:
 
 
 61
 (a) The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death.... [Emphasis added.]
 
 
 62
 Our review of the case law under Sec. 905(a) shows a nearly uniform interpretation of the statute prior to Lockheed. The first Supreme Court case addressing the right of contribution in light of the LHWCA is Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952). The facts are simple: an employee of Haenn was injured on one of Halcyon's ships while making repairs; the employee sued Halcyon on the grounds of negligence and unseaworthiness; the jury found Haenn 75% and Halcyon 25% liable. The Court declined to apply the admiralty collision doctrine "that the mutual wrongdoers shall share equally the damages sustained by each, as well as personal injury and property damages inflicted on innocent third-parties," id. at 284, 72 S.Ct. at 279, and stated categorically that a right of contribution did not exist in maritime, noncollision cases. Noting the extensive legislation in this field, i.e., the Harbor Workers Act, the Jones Act, the Public Vessels Act, the Limited Liability Act, and the Harter Act, the Court held: "In view of the foregoing, and because Congress while acting in the field has stopped short of approving the rule of contribution here urged, we think it would be inappropriate for us to do so." Id. at 287, 72 S.Ct. at 280. Although the Court did not reach the issue of the impact of Sec. 905(a), later decisions have explained that Halcyon stands for the principle that contribution actions against the compensation-paying employer are barred by Sec. 905(a).
 
 
 63
 Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), was one of these explanatory decisions. The Supreme Court clarified that "despite the occasional breadth of its dictum, ... Halcyon stands for a more limited rule than [an] absolute bar against contribution in noncollision cases...." Id. at 111, 94 S.Ct. at 2177. The Court recognized instead "the well-established maritime rule allowing contribution between joint tortfeasors." Id. at 113, 94 S.Ct. at 2178. But this rule was limited by the exclusivity provision of the LHWCA when contribution was sought from the compensation-paying employer of the injured worker. The Cooper Court pointed out that this result was reached in Atlantic Coast Line R. Co. v. Erie Lackawanna R. Co., 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972), where "Erie, against whom contribution was sought, was the plaintiff's employer...." Cooper, 417 U.S. at 114, 94 S.Ct. at 2179. The Court stated that it had ruled Erie to be "entitled to the limitation of liability protections of the Harbor Workers' Act, just like the employer in Halcyon." Id. And again, it stated, "Erie was accordingly entitled to the protective mantle of the Act's limitation-of-liability provisions." Id. at 115, 94 S.Ct. at 2179. The Court concluded by saying that "Atlantic proves only that our decision in Halcyon was, and still is, good law on its facts." Id. This interpretation of Halcyon and Atlantic was later reaffirmed in Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), where the Court stated: "We ... held that the shipowner could not circumvent the exclusive-remedy provision by obtaining contribution from the concurrent tortfeasor employer. Halcyon Lines...." Id. at 261, 99 S.Ct. at 2757.
 
 
 64
 We note that our construction of Sec. 905(a) is in accord with the most recent authoritative expressions of Congress. Senator Nickles, the chair of the Senate Labor Subcommittee and one of the managers of the 1984 Amendments to the Longshore Act, explained the conference committee's concerns to the Senate:
 
 
 65
 The conferees were also concerned over the effect of the Supreme Court's decision in Lockheed Aircraft Corp. v. United States et al, U.S. [190, 103 S.Ct. 1033, 74 L.Ed.2d 911], which decided that the Federal Employees' Compensation Act did not bar third party claims for indemnification. Because section 5(a) of the Longshore Act contains nearly identical language to FECA, we considered an amendment to section 5(a). However, the plain meaning of the existing language indicates that there should be no third party liability. In addition, the clear congressional intent of the 1972 amendments to the act was to eliminate the problem of "circular suits" whereby employers paid workers compensation and then through suits by third parties became liable for additional amounts.
 
 
 66
 130 Cong.Rec. 11621 (daily ed. Sept. 20, 1984).
 
 
 67
 The Courts of Appeals, so far as we can determine, also have interpreted Sec. 905(a) to bar contribution, and some forms of indemnity, from an LHWCA employer. See, e.g., Zapico v. Bucyrus-Erie Co., 579 F.2d 714-19 (2d Cir.1978) (Friendly, J.); Watz v. Zapata Off-Shore Co., 431 F.2d 100, 120 (5th Cir.1970); Horton & Horton, Inc. v. T/S J.E. Dyer, 428 F.2d 1131, 1133-34 (5th Cir.1970); see also American Mutual Liability Insurance Co. v. Matthews, 182 F.2d 322 (2d Cir.1950); St. Julien v. Diamond M. Drilling, 403 F.Supp. 1256, 1259 (E.D.La.1975). In these and other cases, frequently a distinction has been drawn between contractual (express or implied) indemnity, and noncontractual indemnity. Where indemnity is sought on the basis of an express or implied contract, the indemnity action has been held to proceed not "on account of injury," Sec. 905(a), to the employee but because of the contract. See, e.g., Pippen v. Shell Oil Co., 661 F.2d 378, 386-88 (5th Cir.1981); Zapico v. Bucyrus-Erie Co., 579 F.2d at 718, 721-22.
 
 
 68
 Here, defendants sue only for contribution and noncontractual indemnity. Based on the principles of Halcyon and Atlantic, as interpreted by Cooper Stevedoring and Edmonds, we rule that the contribution claims against BIW in its capacity as employer are barred by the exclusive-remedy provision of the LHWCA, 33 U.S.C. Sec. 905(a). As far as the noncontractual indemnity claims are concerned, the facts presented here compel us to characterize them as tort based contribution claims, see supra note 2. Accordingly, these claims are also barred by Sec. 905(a).
 
 
 69
 Because the exclusivity provisions of both the Maine Act, Sec. 4, and the federal LHWCA, Sec. 905(a), bar these third-party claims against BIW qua employer, we have no need to reach the question whether the LHWCA preempts an inconsistent state exclusivity provision.
 
 
 70
 We have carefully considered defendants' other claims for relief and find them without merit. As far as the pro tanto claim is concerned, we note that the Maine Supreme Judicial Court has very recently rejected defendants' position. See Diamond International Corp. v. Sullivan & Merritt, Inc., 493 A.2d 1043 (Me.1985).
 
 
 71
 The judgment of the district court dismissing the third-party complaint is affirmed.
 
 
 
 [1]
 Congress has modified the name of the Act by changing "Longshoremen" to "Longshore." See Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub.L. No. 98-426, Sec. 27(d)
 
 
 [2]
 Defendants allege no contractual basis for indemnity but only noncontractual indemnity. As the noncontractual indemnity here appears to be based upon tort theory, see Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 718 (2d Cir.1978), and is in effect only a more extreme form of contribution, see id., we shall refer henceforth only to defendants' right to contribution. Clearly, if defendants have no right to partial contribution based on applicable tort principles, they have no right to indemnification of the whole of their damages based on those same tort principles
 
 
 [3]
 For a discussion of the difference between the application of admiralty law and assertion of admiralty jurisdiction, see our discussion in Austin v. Unarco Industries, Inc., 705 F.2d at 6 n. 1; see also Kermarec v. Compagnie Generale, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959); Harville v. Johns-Manville Products Corp., 731 F.2d at 778-79
 
 
 [4]
 Keene Corp. v. United States, 700 F.2d 836 (2d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983)
 
 
 [5]
 White v. Johns-Manville Corp., 662 F.2d 234 (4th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982), vacated on other grounds sub nom. Oman v. Johns-Manville Corp., 764 F.2d 224 (4th Cir.1985) (en banc )
 
 
 [6]
 Owens-Illinois v. United States District Court, 698 F.2d 967 (9th Cir.1983)
 
 
 [7]
 Judge Campbell feels that it is not necessary to fully adopt the Harville approach and would prefer to rest on Unarco
 
 
 [8]
 The one quarrel we have with some of our sister circuits is the emphasis they placed on long-term, latent occupational disease as not bearing sufficient maritime connection. See, e.g., Woessner v. Johns-Manville Sales Corp., 757 F.2d 634, 647 (5th Cir.1985) ("the type of injury involved here bears little if any relationship to maritime navigation or commerce"). We disagree most strongly with this view and point to, e.g., one of that circuit's own cases, Castorina v. Lykes Brothers Steamship Corp., 758 F.2d 1025 (5th Cir.1985) (Wisdom, J.), where the plaintiff had for many years offloaded sacks of raw asbestos shipped in loose weave burlap bags aboard defendant's ships. Plaintiff's asbestosis was clearly caused by "traditional maritime activity." We think that the proper analytical step is to ask whether the causation of the injury had a sufficient connection to traditional maritime activity, not whether the type of injury, e.g., trauma, latent occupational disease, possessed the necessary nexus. We think that the concern Congress expressed in the 1984 Amendments to the Longshore Act over the difficulties that maritime workers were experiencing in gaining compensation for latent occupational disease bolsters the case for not using the type of injury as part of the hurdle for maritime tort actions. See H.R.Rep. No. 98-570, on P.L. 98-426, 98th Cong., 2d Sess., reprinted in U.S.Code, Cong. & Ad.News 1984, 2734, 2743 (The Committee "has amended the current law in several significant respects to insure that long-latency occupational disease claimants do not continue to encounter the severe procedural hurdles which the Longshore Act has presented in the past")
 
 
 [9]
 In Lundy the plaintiff was injured on a vessel which was 97% complete but which had not completed sea trials. The district court had held that an incomplete vessel was not a "vessel" within the meaning of Sec. 905(b) and barred the action. The Fifth Circuit disagreed in a short per curiam opinion, holding that the definition of "vessel" provided in the definitional section of the LHWCA, 33 U.S.C. Sec. 902(21), encompassed torts suffered on an incomplete vessel such as occurred there. The court determined that deciding whether a Sec. 905(b) action was properly-brought was merely a matter of turning to the definitions for "vessel" and "covered employee," and if these elements were satisfied, the action could proceed. Whether Sec. 905(b) encompassed only maritime torts was not raised before the panel, nor did the court consider the question sua sponte
 
 
 [10]
 In McCarthy, a painter was injured while painting the mainmast and spars of the Bark Peking, a vessel permanently anchored and used as a museum. The Second Circuit had originally held that the plaintiff was not a covered employee for purposes of LHWCA compensation, and thus the Sec. 905(b) action could not be brought. The Supreme Court vacated the initial decision for reconsideration in light of Director, OWCP v. Perini North River Associates, 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983), which is an opinion discussing the "status" requirement for LHWCA compensation. On the second trip, the Second Circuit ruled that Perini required that plaintiff be held a covered worker for compensation purposes. The McCarthy court apparently was not asked, and did not consider whether Sec. 905(b) jurisdiction required that the Executive Jet nexus test be satisfied. It is likely that McCarthy has been implicitly overruled by Congress in the 1984 Amendments to the Longshore Act. See Pub.L. No. 98-426, 98th Cong., 2d Sess.; H.R.Rep. No. 98-570, which proscribes compensation coverage for museum employees
 
 
 [11]
 The Hall court did not cite any legislative history to bolster its position
 
 
 [12]
 It is inherently difficult to identify a congressional intention to tie Sec. 905(b) jurisdiction to pre-Executive Jet boundaries since Sec. 905(b) was enacted prior to the rendering of the Executive Jet (and Foremost Insurance ) decision(s). Thus, there was no predicate for the intention the Fifth Circuit ascribes to Congress except as a hypothetical, and none was recorded in the legislative history of the statute
 
 
 [13]
 The statutes identified in Sec. 4 relate to employers' liability in the absence of workers' compensation, actions under the Maine Tort Claims Act, and actions for wrongful death
 
 
 [14]
 The pertinent part of 33 U.S.C. Sec. 905(a) provides:
 The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, ....