**EAGLE–PICHER INDUSTRIES, INC.**

v.

**UNITED STATES of America.**

**Civ. A. No. 85–4846.**

United States District Court,
E.D. Pennsylvania.

March 18, 1987.

---

Joe G. Hollingsworth, Edward M. Fogarty, Gary I. Rubin, Washington, D.C., Barbara Pennell, Philadelphia, Pa., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Edward S.G. Dennis, Jr., U.S. Atty., J. Patrick Glynn, Director, Harold J. Engel, Deputy Director, Joseph B. Cox, Jr., Asst. Director, David S. Fishback, Trial Atty., Torts Branch, Civ. Div., Robert N. Kelly, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

LOUIS H. POLLAK, District Judge.

This is a suit against the United States brought by Eagle-Picher Industries, Inc., under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the United States has moved to dismiss for failure to state a claim on which relief can be granted. In the alternative— i.e., in the event that its Rule 12(b)(6) motion is denied—the United States asks that the governing legal questions be certified to the Court of Appeals, pursuant to 28 U.S.C. § 1292(b). To clarify the issues tendered by these motions, it will be helpful to describe the background of this litigation.[1]

## I.

In 1979, Eagle-Picher and twenty-one other manufacturers and/or distributors of asbestos were sued by Charles and Thelma Press in the Philadelphia Court of Common Pleas. *Charles Press v. Johns-Manville Corp.*, No. 4802 (Case No. 8), Pennsylvania Court of Common Pleas, Philadelphia County, January Term, 1979. The gravamen of that law suit was that Mr. Press had been a civilian shipyard worker employed by the United States at the Philadelphia Naval Shipyard (hereinafter "PNS") to do sheetmetal work from 1941 to 1943, and from 1946 to 1979,[2] and that in the course of this employment he had been "exposed to asbestos in connection with the application, use, and removal" of asbestos-based insulation materials manufactured and distributed by the defendants. Amended Complaint, *Eagle-Picher Industries, Inc. v. United States of America*, (E.D.Pa., C.A. No. 85-4846) paragraph 11. In 1983, Mr. Press died of mesothelioma, asbestosis and respiratory failure. Mrs. Press continued to pursue her late husband's claim and her own consortium claim, and in February of 1984 she won an aggregate verdict of $575,000 against Eagle-Picher and six other defendants. Two months later, Eagle-Picher settled its portion of Mrs. Press' law suit for $67,824.40.

In February of 1985, Eagle-Picher sought contribution or indemnity from the

---

1. The facts recited below are based on the allegations in Eagle-Picher's amended complaint, the pleading which is the target of the motion to dismiss; in addressing that motion, those allegations are taken to be true.

2. From 1943–46 Mr. Press was in the Navy.

United States. Following the procedural scenario prescribed by the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Eagle-Picher first filed an administrative claim in the amount of $69,356.31, a sum reflecting the Press settlement figure plus certain costs connected with the defense and settlement processes. In the ensuing six months the United States took no dispositive action on Eagle-Picher's claim. Thereafter, on August 20, 1985, Eagle-Picher initiated suit in this court.

The complaint initially filed by Eagle-Picher advanced numerous theories of recovery in support of its claim that the United States was indebted to it for the sum spent to resolve the Press litigation. One of those theories—and only one—had, a year before, in a case much like the one at bar, been found to be a viable basis for a claim of contribution or indemnity against the United States. That analogous case—also on my docket—was *Colombo v. Johns-Manville Corp.*, 601 F.Supp. 1119 (E.D.Pa. 1984). There, George Colombo, a government shipyard worker employed at PNS, sued Pittsburgh-Corning, an asbestos man-

ufacturer, for injuries allegedly suffered as a result of his exposure to asbestos, some of which he claimed occurred on board vessels owned by the United States. Pittsburgh-Corning in turn impleaded the United States as a third-party defendant. The third-party claim sustained in *Colombo* rested on the Federal Tort Claims Act, which imposes tort liability on the United States whenever such liability would attach to "a private individual under like circumstances." 28 U.S.C. § 2674. I determined that, had the United States been a *private* Pennsylvania shipowner, covered by the Pennsylvania Workmen's Compensation Act (hereinafter "PWMCA"), and had Mr. Colombo been employed by that shipowner to work on one or more of its ships, Mr. Colombo could, pursuant to Section 5(b) of the Longshoreman and Harbor Workers' Compensation Act (hereinafter "LHWCA"), 33 U.S.C. § 905(b),[3] have brought a negligence action against the shipowner.[4] I further determined, in *Colombo*, that Pittsburgh-Corning was substantively entitled to implead the United States, because

3. 33 U.S.C. § 905(b), added to LHWCA in 1972, provides:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide shipbuilding or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 902(3) provides:

> The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder and ship-breaker....

In 1984, § 905(b) was amended, but the amendment only applies to injuries subsequent to September 28, 1984, and hence has no bearing on this litigation or some hundreds of other cases of like chronology pending in numerous federal courts. The 1984 amendment to § 905(b) replaced the third-to-last sentence ("If such person ...") with the following sentence:

> If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.

4. This would have been so notwithstanding that the United States, were it a private entity, would, *qua* Mr. Colombo's employer, presumably also have been liable to Mr. Colombo for workmen's compensation benefits. With respect to the argument that a private employer, covered by PWMCA, would be protected by PWMCA's exclusivity provisions from an employee's negligence action, I held that the state statute's exclusivity provisions would be preempted by Section 5(b) of LHWCA for persons covered by the federal statute. For coverage under the federal statute, see note 3, *supra*.

"both Pennsylvania law and federal maritime law provide for contribution among joint tortfeasors, where both are actively negligent." 601 F.Supp. at 1139. And I rejected the argument advanced by the United States that a third-party plaintiff's substantive entitlement to implead an employer as joint tortfeasor is, as respects employers covered by LHWCA, barred by the exclusivity language in Section 5(a) of the Act, 33 U.S.C. § 905(a).[5] Because *Colombo* settled, the Court of Appeals for the Third Circuit had no opportunity to review the correctness of this court's decision sustaining the legal sufficiency of Pittsburgh-Corning's third-party tort claim against the United States. The issues involved in *Colombo* have not been addressed by the Third Circuit in any other case.

In the instant case, subsequent to the filing of Eagle-Picher's multi-count complaint against the United States, a chambers conference was held. At that conference the parties agreed to pursue the following course of action: Eagle-Picher would file an amended complaint, confining its claim to the count modelled on the third-party tort claim sustained in *Colombo*. On the filing of the amended complaint, the United States would move (a) to dismiss for failure to state a legally cognizable claim, and (b), in the alternative, for certification of the question to the Third Circuit. The

motion to dismiss was, in effect, to be a request that I reconsider my *Colombo* ruling in light of an interpretation of LHWCA presented in two supervening decisions of the First Circuit, *Drake v. Raymark Industries, Inc.*, 772 F.2d 1007 (1st Cir., 1985), *cert. denied*, 476 U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986) and *In re All Maine Asbestos Litigation (PNS Cases)*, 772 F.2d 1023 (1st Cir.1985), *cert. denied*, 476 U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). To these decisions I now turn.

II.

A. *Drake v. Raymark Industries*

*Drake* was a case very like *Colombo*, except that the third-party defendant was a private entity. Mildred Drake, whose late husband, Forrest Drake, was a shipyard worker employed by Bath Iron Works (hereinafter "BIW"), brought a diversity products-liability action in the United States District Court in Maine against several manufacturers and distributors of asbestos products. The complaint alleged that Mr. Drake had contracted asbestos-related diseases from defendants' products while engaged in shipbuilding and ship-repair operations on vessels in the BIW shipyards. Raymark Industries and other defendants filed a multi-count third-party complaint against BIW in the *Drake* litiga-

---

**5.** Section 5(a) provides:

The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee. For purposes of this subsection, a contractor shall be deemed the employer of a

subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title. In holding that Section 5(a) does not address third-party claims, I followed Judge Gignoux's thoughtful analysis in *In re All Maine Asbestos Litigation (BIW Cases)*, 589 F.Supp. 1563, 1570–71 (D.Me.1984), which transposes to LHWCA the reasoning of the Supreme Court in *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983). In *Lockheed*, the court construed the virtually identical exclusivity provisions of the Federal Employees Compensation Act (hereinafter "FECA"), 5 U.S.C. § 8116(c), and concluded that those provisions did not bar petitioner's third-party indemnity action against the United States. The First Circuit, in *Drake v. Raymark Industries Inc.*, 772 F.2d 1007, 1020, 1022 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986), appeared to regard *Lockheed* as offering little guidance with respect to LHWCA; with all respect, I continue to find *Lockheed* pertinent and compelling.

tion, as well as in approximately fifty other cases.[6] In a series of opinions, Judge Gignoux dismissed all contribution/indemnity counts of the third-party complaint.[7] The count based on § 905(b) of LHWCA was found wanting because, so Judge Gignoux determined, "BIW was not during the relevant periods the owner *pro hac vice* of vessels being constructed or repaired in its yard...."[8] The First Circuit affirmed all of Judge Gignoux's rulings, but did not adopt all of his reasoning: In sustaining dismissal of the § 905(b) count, the First Circuit blazed a trail longer and broader than Judge Gignoux's.

To understand the First Circuit's approach to the matter, it will be useful to refer briefly to the general structure of LHWCA. Complementing the Jones Act, which provides federal protection for seamen, the Longshoremen's and Harbor Workers' Compensation Act provides federal protection for land-based maritime workers—i.e., all persons "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker...." 33 U.S.C. § 902(3). Most of the provisions of LHWCA comprise a workmen's compensation statute. However,

§ 905(b), added in the 1972 revision of the Act, establishes a statutory cause of action sounding in tort where the injury complained of is the result of negligence on the part of a "vessel":

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party ... and the employer shall not be liable to the vessel for such damages directly or indirectly.... [9]

The First Circuit, in describing the third-party claims brought by Raymark and the other *Drake* defendants against Bath Iron Works, characterized the central issue—and its resolution of that issue—in the following terms:

> Appellee BIW contends that defendants' § 905(b) action cannot be maintained because the injury allegedly caused by BIW's dereliction of duty as a shipowner *pro hac vice* was not a maritime tort, which is a fundamental requirement for an injury to be cognizable under § 905(b). The appellants respond by arguing that an independent basis for admiralty jurisdiction need not be shown to redress an injury under the section;

---

**6.** *See Drake,* 772 F.2d at 1009.

**7.** For a summary of these rulings see *Drake,* 772 F.2d at 1010–11.

**8.** *Bernier v. Johns-Manville Sales Corp.,* 547 F.Supp. 389, 390 (D.Me.1982), *quoted in Drake,* 772 F.2d at 1010–11.

**9.** The statutory conception of the "vessel" as defendant is traceable to the seaman's traditional entitlement to sue in admiralty for injuries caused by his ship's unseaworthiness. In *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court extended unseaworthiness doctrine to protect not only crew members but also longshoremen injured as a result of the unseaworthiness of ships on which they were working. In *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that a shipowner sued by a longshoreman for unseaworthiness could seek reimbursement from the longshoreman's employer where the latter created the unseaworthy condition by breaching its implied contractual com-

mitment to the shipowner to stow cargo "in a reasonably safe manner"; and the shipowner's reimbursement claim was not barred by the facts that (1) before bringing his *Sieracki* claim, the longshoreman had recovered compensation from his employer's carrier pursuant to LHWCA and (2) Section 5 of LHWCA (then 33 U.S.C. § 905; now 33 U.S.C. § 905(a)) provided that an employer's compensation liability "shall be exclusive and in place of all other liability of such employer to the employee ... and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death...." In 1972, § 905(b) replaced the longshoreman's unseaworthiness claim ("essentially a species of liability without fault," 328 U.S. at 94, 66 S.Ct. at 877) with the statutory negligence claim whose proper contours are at issue in this case, and barred recovery by the shipowner against the plaintiff's employer. A 1984 amendment to § 905(b) precludes a § 905(b) suit where the shipowner is also the plaintiff's employer; however, as explained in note 3 *supra,* that amendment is controlling only with respect to injuries subsequent to September 28, 1984, and hence is without application to the present case.

all that is required is satisfaction of the literal words of the statute, which does not so much as mention the words "maritime tort" or "admiralty jurisdiction."

The question before us, then, is: does § 905(b) recognize only maritime torts, i.e., torts cognizable in admiralty (regardless of the actual basis of jurisdiction, such as diversity), or does its range encompass nonmaritime torts occurring on a vessel but where the tests for admiralty jurisdiction are not satisfied? After careful study, we think the scope of § 905(b) is limited to maritime torts. 772 F.2d at 1012.

In anchoring the issue in the concept of "maritime tort," the First Circuit expressly linked its analysis to its own prior decision in *Austin v. Unarco Industries, Inc.,* 705 F.2d 1 (1st Cir.1983), *cert. dismissed,* 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983), and to the Supreme Court's decision in *Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Because of their centrality to the *Drake* opinion, a brief summary of each of these cases may be helpful.

*Executive Jet* was a negligence action brought in admiralty by the owners of a jet airplane against the City of Cleveland, the manager of Cleveland's municipal Burke Lakefront Airport, and an air traffic controller on duty at the airport at the time of the alleged negligence. The alleged negligence was failure to keep the airport free of, and/or failure to advise the plane crew of the presence of, seagulls whose inspiration into the jet engines on takeoff brought the plane to an immediate and abrupt halt in Lake Erie.[10] Justice Stewart, writing for a unanimous Court, affirmed the determinations of the district court and the Sixth Circuit that the district court lacked subject-matter jurisdiction. Admiralty jurisdiction over "aeronautical torts" is not established simply by the happening of a wrong "on or over navigable waters—whatever that means in an aviation context"; it is also necessary "that the wrong bear a significant relationship to traditional maritime activity." 409 U.S. at 268, 93

S.Ct. at 504. " ... [W]e hold that, in the absence of legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States." *Id.* at 274, 93 S.Ct. at 507 (footnote omitted).

*Austin v. Unarco* was a suit against several manufacturers and distributors of asbestos brought by the estate of a deceased Bath Iron Works employee who "worked on board ships berthed in the Kennebec River at BIW, both on new ships berthed in the river after launching and on older ships brought into BIW for repair. His primary job was to follow behind the pipecoverers, who applied asbestos insulation products to the ships' pipes, boilers and others machinery, and paint over the asbestos insulation. He was also responsible for sweeping up asbestos scraps left by the pipecoverers." 705 F.2d at 3. The court rejected plaintiff's contention that the case should have been tried not as a diversity case but in admiralty, where Maine's contributory negligence defense would have had no application. "We acknowledge that ... distinguishing between activities that are maritime and those that are not approaches medieval nicety. In this case, however, the conclusion that decedent's activity was not 'traditionally maritime' is indicated by a congeries of factors—the vessel, whether under construction or laid up for repairs, was passive and temporarily incapable of acting as such; the work being done was a major project involving specialized tools and skills, both in kind and in magnitude far beyond that traditionally done by a ship's crew; and the hazards exposed could not be said to be peculiar to maritime navigation. *Id.* at 14.

In *Drake,* having concluded that a § 905(b) cause of action must satisfy a set of requirements for admiralty jurisdiction independent of LHWCA's express statutory requirements, the First Circuit built on *Executive Jet* and *Unarco* to reason as follows:

Because defendants' third-party § 905(b) action is predicated solely upon BIW's

10. Happily, there were no injuries; but the plane sank.

alleged dereliction of duty *qua* shipowner *pro hac vice* vis-a-vis its employee Drake, and not based upon any alleged duty running from BIW to defendants, the proper question is whether plaintiff Drake could have maintained a § 905(b) action against BIW for his injuries. Accordingly, we look to whether the injury forming the basis of Drake's primary action would be cognizable in admiralty, or have admiralty law applied to it.

We consider our decision in *Austin v. Unarco* to have provided the channel markers for deciding that question. As we held there, to qualify as a maritime tort under *Executive Jet*, the wrong (1) must have occurred on navigable waters, *i.e.*, meet a situs or locality test, and (2) must have borne a significant relationship to a maritime activity, *i.e.*, meet a nexus test. *Austin v. Unarco*, 705 F.2d at 8–14. Thus, although we believe that it is necessary for the maintainance of a § 905(b) action that a party allege that a vessel's negligence was the source of the injury, such an incantation does not, as defendants contend, automatically result in the application of admiralty law.

Turning to the *Executive Jet* criteria, we first consider the situs requirement, *i.e.*, that the injury occur or take effect on navigable waters. As the Eleventh Circuit noted in *Harville* [*Harville v. Johns-Manville Products Corp.*, 731 F.2d 775 (11th Cir.1984) ], "when an injury is the result of a number of exposures, only some of which occurred in a maritime situs, and where the effects of the various exposures are indivisible," the question whether the situs test is met is raised. *Harville*, 731 F.2d at 782. That court concluded, in agreement with the Second, Fourth and Ninth Circuits, that the requirement was met "if the plaintiff has been exposed to asbestos on navigable waters regardless of whether he has also suffered exposures on land." *Id.* We see no reason to depart from the majority view on this question and we adopt it as our own. Thus, as in *Austin v. Unarco*, from our review of the record the situs requirement poses no problem to the characterization of Drake's injury

as a maritime tort and "[t]he only issue, therefore, is whether the wrong bears a significant relationship to traditional maritime activity." *Austin v. Unarco*, 705 F.2d at 8–9; *see Executive Jet*, 409 U.S. at 261, 93 S.Ct. at 501.

Since our decision in *Unarco*, several other courts have considered *Executive Jet's* second requirement of a nexus to maritime activity in relation to asbestos injuries sustained by shipyard workers. All have reasoned to the same conclusion albeit using somewhat different markers en route....

In *Unarco*, we focused on the nature of the decedent's job rather than the type of project—vessel construction or repair—on which he worked. We concluded that the plaintiff was entitled to invoke admiralty only if the decedent was "injured while doing work traditionally done by members of the crew and thus, presumably, subject to many of the same hazards as seamen." 705 F.2d at 12. We ruled that because the decedent had been engaged in work "requiring special equipment and skills" not commonly found among the members of the ship's crew, admiralty law was not applicable to plaintiff's claims. *Id.* at 12–13. Other courts prior to the Eleventh Circuit's ruling in *Harville* focused on other criteria. The *Harville* Court, however, summarized and blended these various considerations, including our own, into a four-part test.... The criteria to be considered under this approach are the function and roles of the parties, the type of vehicles and instrumentalities involved, the causation and type of injury, and traditional concepts of the role of admiralty law.... Our conclusion, then, is that the injury sustained by Drake lacked sufficient connection to the traditional concerns of admiralty, and thus, neither plaintiff nor defendants can bring a § 905(b) negligence action against BIW *qua* shipowner *pro hac vice.*

772 F.2d at 1014–16 (footnotes omitted).

**B.** *In re All Maine Asbestos Litigation (PNS Cases)*

*In re All Maine Asbestos Litigation (PNS Cases)*, 772 F.2d 1023 (1st Cir.1985),

*cert. denied,* 476 U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986), was an aggregation of asbestos cases in which plaintiffs, or plaintiffs' decedents, were or had been shipyard workers employed by the United States on government vessels at the Portsmouth Naval Shipyards. Suits were brought against manufacturers and distributors of asbestos products utilized on the government vessels during the periods of employment. The defendants sought contribution/indemnity from the United States. Judge Gignoux dismissed all third-party counts except the count based upon the United States' alleged breach of duties owed plaintiff in its capacity as shipowner.[11] *In re All Maine Asbestos Litigation,* 581 F.Supp. 963, 980–81 (D.Me.1984); *In re All Maine Asbestos Litigation (PNS Cases),* 589 F.Supp. 1571, 1576 (D.Me.1984). The viability of that count, predicated on the Federal Tort Claims Act, was certified to the First Circuit. The appellate court rejected the third-party plaintiffs' reliance on § 905(b) as a basis of tort liability. *Drake v. Raymark,* which had been decided by that court three weeks before, was found to be controlling:

> In *Drake* we held that defendant manufacturers' third-party claim against a private shipyard as owner *pro hac vice* would not lie under § 905(b) because that section countenances only maritime torts. *Drake v. Raymark Industries, Inc.,* at 1012. Since to qualify as a maritime tort the wrong must have borne some relationship to "traditional maritime activity," *Executive Jet Aviation v. Cleveland,* 409 U.S. 249, 261, 93 S.Ct. 493, 501, 34 L.Ed.2d 454 (1972), and the universal ruling of all circuits to have considered this type of wrong is that it does not bear such a relationship, *see Drake,* at 1015–16, no § 905(b) action could have been brought by plaintiffs against the owners of the ships on which they were doing construction or repair work. It follows that defendants have no contribu-

tion action under the section, either, since the only duties alleged to have been owed were owed to the employees, not the defendants. Accordingly, we rule that defendants' contribution and indemnity action against the third-party defendant based upon § 905(b) must be dismissed for failure to state a claim on which relief can be granted.

772 F.2d at 1029–30.

### C. Was *Colombo* Wrongly Decided?

If *All Maine Asbestos Litigation* was correctly decided, *Colombo* was wrong. Whether *All Maine Asbestos Litigation* was correct depends, in turn, on whether *Drake* was correct. I now consider that question.

*Drake,* as the opinion acknowledges, cannot be squared with the Fifth Circuit's opinion in *Hall v. Hvide Hull No. 3,* 746 F.2d 294 (5th Cir.1985). See *Drake,* 772 F.2d at 1017–19. *Hall* was a consolidation of three section 905(b) cases. In each, a shipyard worker was injured during ship construction. The common question of law was whether the ship work-sites—"floating hulls" which were at 75% to 90% of operational completion—had attained the status of "vessels" within the meaning of § 905(b). In determining whether its admiralty jurisdiction extended to the workers' § 905(b) claims, the Fifth Circuit pronounced itself "unable to accede to the argument of the defendants that, even though the hull might under the statutory intent *of § 905(b)* be considered a 'vessel' against which a negligence action is recognized by § 905(b), nevertheless, federal admiralty *jurisdiction* would not extend to a § 905(b) action against such a vessel because a hull under shipbuilding construction bears no significant relationship to traditional maritime activity. We find no such distinction between a § 905(b) cause of action and admiralty jurisdiction to have been

---

**11.** The First Circuit concluded that the district court's characterization of the surviving count, Count VI, as a claim for contribution cr indemnification from the United States as *shipowner* was too narrow. The appellate court concluded

that "Count VI on its face encompasses employer and shipyard owner theories" as well. *In re All Maine Asbestos Litigation (PNS Cases),* 772 F.2d at 1027.

Congressionally intended by the enactment of § 905(b)." 746 F.2d at 300.[12]

*Hall*, like *Drake*, concluded that § 905(b) did not extend beyond the reach of federal admiralty jurisdiction. *See Drake*, 772 F.2d at 1018. But, unlike *Drake*, *Hall* also concluded that admiralty jurisdiction over § 905(b) actions was established by Congress when it created the statutory tort remedy:

> For purposes of federal admiralty jurisdiction, maritime connexity (*Executive Jet's* requirement that the injury be in a "traditional maritime activity", was, in effect, Congressionally so determined through Congressional acceptance, in the 1972 revision of the Longshoreman's Act, of pre–1972 traditional judicial determinations of the maritime character of the activity involved in injuries to these amphibious workers.

*Hall*, 746 F.2d at 303.

Recently, in *May v. Transworld Drilling Co.*, 786 F.2d 1261 (1986), the Fifth Circuit has reasserted the connection between a § 905(b) action and admiralty jurisdiction but found that, where an injury occurred on land and therefore did not satisfy the situs prong of *Executive Jet's* test of admiralty jurisdiction, the injured worker failed to state a cause of action under § 905(b):

> [W]e here explicitly hold that Sec. 905(b) permits only the assertion of a claim for a maritime tort. Only if a claimant first alleges facts comprising a maritime tort do we need inquire whether he has established the specific elements of a Sec. 905(b) cause of action.

786 F.2d at 1264.

While *May* and *Hall* agree that § 905(b) actions are encompassed by the admiralty jurisdiction of the federal courts, they appear to disagree about which analysis—the analysis of § 905(b) or of general admiralty jurisdiction—should guide the analysis of the other. In *May*, the Fifth Circuit applied the test articulated in *Executive Jet* to its analysis of the scope of § 905(b); and in *Hall*, it applied the statutory requirements of § 905(b), read together with its legislative history, to its analysis of the jurisdictional question.[13] The *May* approach leads to a narrower interpretation

**12.** *Hall* was written by the late Judge Albert Tate, Jr. Judge Tate was also the author of another important analysis of LHWCA, the *en banc* opinion in *Boudreaux v. American Workover, Inc.*, 680 F.2d 1034 (5th Cir.1982), cited *infra*, note 17. These thoughtful and comprehensive opinions are characteristic of the exemplary judicial service performed by Judge Tate in over thirty years on the Louisiana Court of Appeals, the Louisiana Supreme Court and the Fifth Circuit. To the writer of this opinion, who had the good fortune of being a law school contemporary of Judge Tate four decades ago, *Hall* and *Boudreaux* aptly reflect the Judge's own perception of the proper judicial role, as recorded in the Memorial Resolution adopted by his colleagues at the 1986 Fifth Circuit Conference (798 F.2d XCI, XCII):

> He once summed up his philosophy of judging: a judge should render a technically sound opinion that fairly applies relevant authorities; reaches a humanly fair and socially useful result subject to the limitations of judicial review and the demands of consistency with legal doctrine; and ... considers the implications of applying the rationale of the opinion to different factual situations that may appear in the future. In plainer words, he often asked: would this sound fair to a barber in Ville Platte?
>
> Who could ask for more in a judge? Who would settle for less?

**13.** It may be noted that the *Hall* approach, applied to the facts of *May* (an injury occurring on land) might not change the result in *May* under the law of the Fifth Circuit. In *Parker v. South Louisiana Contractors, Inc.*, 537 F.2d 113 (1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977)—a Fifth Circuit case subsequent to *Executive Jet* heavily relied on in *May*—the court held that Congress' 1972 landward extension of LHWCA ("an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building, a vessel)," 33 U.S.C. § 903(a)) applies only to compensation coverage, not to the new third-party tort remedy embodied in § 905(b). While the asserted distinction between the scope of compensation coverage and tort liability with respect to land-based injuries is not relevant in our case, the First Circuit in *Drake* suggested that the distinction between compensation coverage and tort liability justified its determination that Mr. Drake—who, like Mr. Press, was injured upon navigable waters—was not covered by § 905(b). As I will discuss below, the distinction on which the First Circuit relied is inapplicable to the issue presented in *Drake* and the case before me.

of § 905(b); the *Hall* approach leads to a broader interpretation of admiralty jurisdiction.[14]

To support its conclusion that both § 905(b) and admiralty jurisdiction extend to the cases before it, the Fifth Circuit in *Hall* relied on the Supreme Court's decision in *Director, OWCP v. Perini North River Associates,* 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983). The *Hall* court characterized the *Perini* ruling as follows:

> [T]he Supreme Court itself has held that the remedies of employees who are covered by the Longshoremen's Act and who are injured on navigable waters are not affected by *Executive Jet.* Thus, in effect, if injury to an Act-covered employee was considered to constitute a maritime tort prior to the 1972 amendments, then "the wrong [to him] bear[s] a significant relationship to traditional maritime activity," so as to meet this quoted "nexus" prong of the *Executive Jet* test for maritime-tort federal admiralty jurisdiction.

*Hall,* 746 F.2d at 302 (citations omitted). In *Hall,* the Fifth Circuit cited *Perini* for the proposition that the test articulated in *Executive Jet* does not so comprehensively define the scope of admiralty jurisdiction that all other sources of that definition, including the statutory language of § 905(b) and the legislative history that shaped it, have become irrelevant. An examination of *Perini* suggests that it may properly be read more broadly still.

*Perini* involved a workmen's compensation claim under LHWCA. Claimant Raymond Churchill worked for a construction firm, Perini North River Associates, which was building the foundation of a Manhattan sewage treatment plant projecting several hundred feet out into the Hudson River. The claimant was injured when standing on a cargo barge directing the unloading from a supply barge of heavy caissons (sections of pipe) which, filled with concrete, were to be anchored in the rock underlying the river bed; a line which held the caissons in place snapped and hit him. Compensation was denied by the Benefits Review Board, which in turn was affirmed by the Second Circuit, the court concluding that the claimant was not a person "engaged in maritime employment," within the meaning of 33 U.S.C. § 902(3), the section of LHWCA which describes the workers covered by the statute. The Supreme Court reversed.

The Court held in *Perini,* quite simply, that:

> when a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement in § 2(3) [33 U.S.C. § 902(3)], and is covered under the LHWCA.... We consider these employees to be 'engaged in maritime employment' not simply because they are injured in a historically maritime locale, but because they are required to perform their employment duties upon navigable waters.

459 U.S. at 324, 103 S.Ct. at 650 (footnote omitted). Although the Court paid considerable attention to the cases discussing admiralty jurisdiction that led to the enactment and subsequent amendment of LHWCA, it sought no interpretive guidance from cases discussing the jurisdictional issue wholly outside the context of LHWCA. Indeed, the Court was quite explicit in finding *Executive Jet* inapplicable to its interpretation of the scope of the Act:

> *Perini* cites our decision in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249 [93 S.Ct. 493, 34 L.Ed.2d 454] (1972), and argues that the LHWCA is premised upon admiralty jurisdiction, which requires a connection between an employee and traditional maritime activity. *Perini's* reliance on *Executive Jet* is misplaced. In that case, the only issue before the Court was whether federal admiralty jurisdiction extended to tort

---

**14.** The United States has advised this court of its understanding that the apparent doctrinal intra-circuit conflict may be resolved *en banc* in *Richendollar v. Diamond M. Drilling Co.,* 784 F.2d 580 (5th Cir.1986), *rehearing en banc granted,* 790 F.2d 442 (1986). The "vessel owner" issue is also said to be pending before the Ninth Circuit in a large number of cases certified under 28 U.S.C. § 1292(b). See Letter of January 6, 1987 to the court from Robert N. Kelly, Esq., p.2.

claims arising out of the crash of an airplane into navigable waters on a flight "within the continental United States, which [is] principally over land." *Id.*, at 266 [93 S.Ct. at 503]. Jurisdiction in *Executive Jet* was predicated on 28 U.S.C. § 1333(1), which provides that the federal district courts have original and exclusive jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction."

The explicit language of *Executive Jet* makes it clear that our discussion was occasioned by "the problems involved in applying a locality-alone test of admiralty tort jurisdiction to the crashes of aircraft" in a situation where "the fact that an aircraft happens to fall in navigable waters, rather than on land, is wholly fortuitous." 409 U.S. at 265, 266 [93 S.Ct. at 503, 504]. Although the term "maritime" occurs both in 28 U.S.C. § 1333(1) and in § 2(3) of the Act, these are two different statutes "each with different legislative histories and jurisprudential interpretations over the course of decades." *Boudreaux v. American Workover, Inc.*, 680 F.2d 1034, 1050 (CA5 1982) (footnote omitted). In addition, Churchill, as a marine construction worker, was by no means "fortuitously" on the water when he was injured.

459 U.S. at 320 n. 29, 103 S.Ct. at 648 n. 29.

In *Perini*, the Court did not clearly establish whether it eschewed the jurisdictional analysis because it determined that the scope of LHWCA was not dependent on the existence of admiralty jurisdiction (as the distinction it draws between the two uses of the word "maritime" suggests) or because it determined that the jurisdictional analysis was subsumed in its interpretation of LHWCA (as the observation that the claimant "was by no means 'fortuitously' on the water" suggests). Stated another way, *Perini* left unresolved the question whether, if called upon to determine whether a claim cognizable under LHWCA properly alleged federal admiralty jurisdiction, the Court would find its interpretation of the Act dispositive of the jurisdictional issue, or whether it would find that interpretation inconclusive and engage in an independent jurisdictional analysis.

What *is* clear is that the Supreme Court held in *Perini* that when an injury occurs in the course of employment over navigable waters, as is alleged in Eagle-Picher's amended complaint, *see, e.g.*, paragraph 30, the injured worker satisfies the "maritime employment" requirement regardless of the specific nature of the worker's job or injury. Indeed, *Perini* expressly rejected respondent's contention that the "maritime employment" language required an "employee injured upon navigable waters ... to show that his employment possessed a direct (or substantial) relation to navigation or commerce in order to be covered." *Perini*, 459 U.S. at 318–19, 103 S.Ct. at 647–48.[15]

In pressing the argument that the Fifth Circuit, in *Hall*, misread LHWCA, the First Circuit, in *Drake*, distinguished the Supreme Court's opinion in *Perini* on the ground that it "was concerned solely with *compensation*, not with maritime tort jurisdiction, and these two boundaries have for a long time been quite distinct...." 772 F.2d at 1018. But *Perini* is not so easily disposed of. In *Perini* the Supreme Court was interpreting the phrase "maritime employment" as used in the definition of "employee" appearing in Section 2(3) of LHWCA, 33 U.S.C. § 902(3). That definition applies both to the compensation provisions of the Act and to Section 5(b), 33 U.S.C. § 905(b)—the provision at issue in *Drake* and here—which provides for tort recovery for "a person covered under this chapter."

The history of another case arising in the waters off Manhattan makes plain that the Court does not endorse as narrow a read-

---

**15.** Even Justice Stevens' dissent in *Perini* assumes that employees satisfy the Section 2(3), 33 U.S.C. § 902(3), requirement of "maritime employment" where they fall within one of the "two important subcategories [of maritime employment], both of which are defined with rea-

sonable clarity." *See Perini*, 459 U.S. at 327, 103 S.Ct. at 652 (Stevens, J., dissenting). One of those two subcategories, "any harbor-worker including a ship repairman, shipbuilder, and shipbreaker," seems to describe "with reasonable clarity" Mr. Press' employment.

ing of *Perini* as the one the First Circuit has articulated. That other case was a § 905(b) suit brought by Craig McCarthy, who was injured while painting the mainmast of defendant "The Bark Peking," a stationary museum ship owned by co-defendant South Street Seaport Museum. The district court granted summary judgment in favor of the defendants. The appeal reached the Second Circuit some months after that court in *Perini* had sustained the dismissal of Raymond Churchill's compensation claim. The Second Circuit affirmed the dismissal of Craig McCarthy's § 905(b) claim, holding that inasmuch as the museum ship "has not put to sea under her own power since the 1930's" and "[h]er present owners ... do not intend to return her to active navigation," plaintiff's work did not constitute "maritime employment" within the meaning of LHWCA and hence plaintiff was outside the coverage of the Act. *McCarthy v. The Bark Peking,* 676 F.2d 42, 45 (2nd Cir.1982). McCarthy then petitioned for certiorari. Thirteen days after reversing the Second Circuit in *Perini*, the Supreme Court entered the following order:

> 82–53 *McCarthy v. Bark Peking.* The petition for a writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Association.*[16]

After further briefing, the Second Circuit filed a new opinion which said, in pertinent part, the following:

> Having reconsidered our prior decision in the light of [*Perini*], as the Court has ordered us to do, we now hold that McCarthy was a covered employee for purposes of the LHWCA, and that the Bark Peking is a "vessel" to the extent

that McCarthy properly may allege the "negligence of a vessel" and thus bring his action for damages under 33 U.S.C. § 905(b) (1976).

We conclude that McCarthy now must be considered to have been engaged in "maritime employment" at the time he was injured on the Bark Peking on December 12, 1979. He was "injured on the actual navigable waters in the course of his employment on those waters...." [*Perini*], 459 U.S. at 324 [103 S.Ct. at 650]. Under this latest Supreme Court decision, no more is required to qualify McCarthy as a statutory "employee."[17]

The Supreme Court denied certiorari.[18]

Injuries sustained by employees while engaged in "maritime employment" are cognizable under § 905(b). As Craig McCarthy was engaged in "maritime employment," so too were George Colombo and Forrest Drake. So too was Charles Press. The motion of the United States to dismiss the amended complaint is denied.

### III.

What remains for disposition is the United States' alternative motion—which Eagle-Picher opposes—to certify to the Court of Appeals, pursuant to 28 U.S.C. § 1292(b), the legal issue canvassed in Part II of this opinion. Section 1292(b) authorizes a district judge to certify an interlocutory order for appellate consideration when the judge is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation...." The prescribed conditions are assuredly met here. Moreover, resolution of the issue by the Third Circuit can be expected to expedite disposition of what the United States characterizes as "100 or more sim-

---

**16.** *McCarthy v. The Bark Peking,* 716 F.2d 130, 131 (2d Cir.1983); see 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983).

**17.** *McCarthy v. The Bark Peking,* 716 F.2d 130, 132–3 (2nd Cir.1983). See also *Boudreaux v. American Workover, Inc.,* 680 F.2d 1034 (5th Cir.1982), cited with approval by Justice O'Connor in the *Perini* footnote quoted above.

**18.** 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984), *rehearing denied,* 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984).

ilar cases in the Eastern District of Pennsylvania in which Raymark Industries, Inc. has impleaded the United States on the same theory as Eagle-Picher." Letter of January 16, 1987, to the court from Robert N. Kelly, Esq., p. 2.[19] More to the point, a Third Circuit ruling on an issue which has engaged the attention of the First, Second, Fifth and Ninth[20] Circuits should give added dimension to the resolution of the issue by the Supreme Court if that tribunal in due course concludes that further review is in order.[21] Accordingly, the motion of the United States to certify the interlocutory order to the Court of Appeals is granted.

### Conclusion

In an order accompanying this opinion, (1) the motion of the United States to dismiss is denied, and (2) the parties are directed to submit a jointly prepared draft form of order of certification.[22]

---

**19.** *See also* Letter of February 12, 1987, to the court from Joe G. Hollingsworth, Esq.; Letter of March 4, 1987, to the court from Robert N. Kelly, Esq.

**20.** See note 14, *supra.* Other courts of appeals have discussed "maritime [tort] jurisdiction," but none seems to have directly addressed the § 905(b) controversy reflected in *Drake, All Maine Asbestos Litigation, Hall, May v. Transworld Drilling Co.,* and *McCarthy v. The Bark Peking.*

**21.** The Court denied certiorari to review *Drake* and *All Maine Asbestos Litigation,* 476 U.S. ——,

106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). Justice White, in a dissenting memorandum, stated that he thought review of the conflict between the First Circuit decisions and the Fifth Circuit's decision in *Hall* was called for.

**22.** It seems sensible for the parties to try to fashion an agreed formulation of the issue of law to be certified to the Court of Appeals. If their collaborative effort is unfruitful, I will formulate the issue. Eagle-Picher's participation in preparing a joint draft form of order is without prejudice to its entitlement to persevere in its opposition to certification.